**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Frank Angelone,** | ) | **CASE NO. 1:08 CV 244** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **City of Cleveland, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon Defendant City of Cleveland's Motion for Summary Judgment (Doc. 21).  For the following reasons, the motion is GRANTED  as to Count Two. The remaining claims are remanded to the Cuyahoga County Common Pleas Court.

<u>**Facts**</u>

Plaintiff, Frank Angelone, filed this Complaint against defendants, City of Cleveland and Patrolman Patrick Brown, in the Cuyahoga County Court of Common Pleas.  The matter was thereafter removed to this Court by defendant City of Cleveland on the basis of federal

1

question jurisdiction inasmuch as the Complaint alleges a § 1983 claim.

Defendant Brown testified to the following.  At the time of the incident giving rise to this lawsuit, Brown had been a Cleveland Police officer since 1993.  On December 28, 2006, Brown had worked the day shift, 7:00 a.m. to 3:00 p.m.  Brown attended his weekly bowling league game after work at Freeway Lanes, located at 130th and Brookpark in Parma, Ohio. The league starts at 4:00 p.m.  Brown had changed into civilian clothes.  Brown drank beer and ate pizza while at Freeway Lanes.  He does not remember if it was beer or non-alcoholic beer, or both.  Brown would typically drink between 3 and 7 beers during the 3 to 4 hour period that he was at the bowling alley.  While at Freeway Lanes, Brown met MaryAnn Fixel, whom he had been acquainted with prior to that day.

Around 6:30 p.m., Brown and Fixel left the bowling alley and went to Quikky's, a bar/restaraunt located a few miles from Freeway Lanes on State Road in Parma.  Quikky's sponsors Brown's bowling league.  Brown and Fixel went in Brown's car, and a couple other bowling league teammates went separately.  While at Quikky's, Brown probably had two or three beers and ate wings.  They were there about an hour and a half, and Brown met Rachael Tulk, whom he had met one time previously.  Brown, Fixel and Tulk left Quikky's by 8:30 or 9:00 p.m. and drove in Brown's car back to Freeway Lanes so that Brown could pick up money from someone to whom he had lent it.  After leaving Freeway Lanes around 10:30 or 11:00 p.m., the trio then planned to go to Saddle Ridge, a country western bar located at Pearl and Brookpark.  Brown headed east out of the parking lot and was stopped at a railroad crossing.  Here, Brown first noticed the Ford Bronco in which plaintiff was a passenger.  It, too, was stopped at the train crossing.  The Bronco was "power-braking" its tires, an action of

2

putting the foot on the brake and the other foot on the gas pedal to make the tires smoke.  As a result, the Bronco was also fishtailing and making noise.  Brown just laughed, but Fixel became upset and took a picture of the Bronco.  Fixel told Brown that she was dating a Brook Park police officer.  She called him on the phone, but he did not answer.  After the train had cleared the tracks, Brown observed the Bronco to begin changing lanes, zipping left and right.  Both vehicles stopped at a red light at Chevy Boulevard, with several cars between Brown's vehicle and the Bronco.  While stopped at the light, Brown again observed the Bronco to be power-braking.  Brown was not following the Bronco at this point, only heading towards the Saddle Ridge.  After the light turned green, Brown observed the driver of the Bronco driving what he considered to be recklessly, including swerving into oncoming traffic.  At that point, Brown telephoned his friends, Cleveland Police Sergeant Tom Shoulders, Cleveland Police Detective Neil Hutchinson and Cleveland Police Officer Tony Lyons.  Brown gave Lyons the Bronco's license plate number and Lyons informed Brown that the vehicle was not stolen.

As the vehicles approached Tiedeman, Brown intended to pull alongside the Bronco to show his police badge and tell the occupants to calm down, but he could not do so.  The Bronco then turned onto Big Creek Parkway and Brown decided to follow it rather than proceeding straight to get to Saddle Ridge.  Brown hoped to see a Parma Police vehicle and wanted to contact the Parma Police but could not recall the phone number.  Brown began flashing his high beam lights at the Bronco.  The Bronco turned onto a side street and Brown continued to follow it.

The Bronco stopped in front of Jimmy's Place, a bar in Parma, owned by plaintiff's father.  Brown saw "at least one guy" running from the vehicle around the front of the bar.

3

He saw a second guy getting out of the Bronco and going towards the back of the vehicle, and into the parking lot behind the bar.  Brown parked his vehicle slightly behind the Bronco, told the women to stay in the vehicle and jumped out.  One occupant of the Bronco, who turned out to be plaintiff, ran to the back parking lot.  Brown knew from experience that there was no other way out of the lot.  He decided to confront him as the other occupants were no longer in sight.  As Brown was running to follow plaintiff, Brown was yelling, "Cleveland Police." Before plaintiff got to the back door of the bar, Brown got in front of the door and started yelling, "Hey, I'm a cop.  I'm a police officer.  I'm a Cleveland police officer.  I need to talk to you."  Brown did not show plaintiff his badge.  As Brown blocked the door, he told plaintiff a couple of times that he was a police officer and wanted to detain him.  Plaintiff attempted to push Brown out of the way to get into the bar, and yelled something such as, "Get the F out of the way."  After plaintiff pushed Brown, Brown said, "That's assault on a police officer."  Plaintiff shoved Brown again.  Brown grabbed plaintiff and took him to the ground.  Brown "was doing what we do as a take-down." Brown, who was bigger than plaintiff, came down on top of plaintiff and may have hit him while knocking him down. Plaintiff hit his head on the concrete and apparently lost consciousness.  Brown then went into the bar and asked someone to call the police. When he came back outside he saw blood on the ground. The Parma police arrived within minutes.  They attempted to take Brown's statement, but, after getting Brown's identification, the police officers told him to leave because people were coming out of the bar and were very upset when seeing plaintiff on the ground.   There was a lot of yelling and commotion, and one patron (possibly the driver of the Bronco) wanted to fight with Brown.  Brown gave a written statement to the Parma police about one

4

week later.  (Brown depo.)  It is not disputed that all of the events took place outside the City

of Cleveland.

Apparently, plaintiff has no recollection of the events that transpired just before he

lost consciousness.[1]  (Doc. 23 at 6)  The Parma Police Department prepared an Investigative

Report.  It is indicated therein that the driver of the Bronco was Jonathan Kish.   There were

two passengers, including plaintiff. Plaintiff was transported to the hospital immediately

following the incident. Only plaintiff and Brown were present when the confrontation outside

the bar occurred.  (Doc. 21 Ex. A)

The City filed administrative charges against Brown.  An administrative pre-

disciplinary hearing was held on August 14, 2008 in the Office of the City of Cleveland

Director of Public Safety to address whether Brown had engaged in improper procedures and

improper conduct.  The matter was then held in abeyance pending this lawsuit.  (Doc. 21 Exs.

E and G)

Plaintiff thereafter filed his Complaint.  Other than a § 1983 claim (Count Two),

plaintiff asserts state law claims for negligence (Count One), assault and battery (Count

Three), negligent and intentional infliction of emotional distress (Count Four) and malicious

conduct (Count Five).

This matter is now before the Court upon defendant City of Cleveland's Motion for

---

[1]      Plaintiff does not submit his own affidavit, nor does it appear that his deposition
        was taken.  In the police Investigative Report, he states that after exiting the
        Bronco, he "started walking fast towards the back door [of the bar]....The guy
        [defendant] came around the Bronco and hit me from behind in the back of the
        head.  That is all I remember.  The next thing I can remember is being at the
        hospital."  (Doc. 21 Ex. A)

5

Summary Judgment.

### **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

6

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

Count Two alleges defendants City of Cleveland's and Patrick Brown's actions deprived plaintiff of his right to be free from unreasonable search and seizure and excessive force.  Plaintiff also alleges a deprivation of substantive and procedural due process.  Plaintiff additionally asserts that his injury resulted from a custom and/or policy of the City of Cleveland which demonstrated a deliberate indifference to the rights and safety of its citizens by failing to provide proper training; failing to investigate the prior allegations of excessive force and wrongful conduct of Brown[2]; failing to remedy a clear pattern of excessive violence

---

[2]        Plaintiff refers to a 1997 incident wherein Brown, while off-duty, supposedly attacked James Martin.  Because, as discussed herein, Brown was not acting under color of law in the current lawsuit, the Court does not reach municipal liability.

on Brown's part; and failing to correct, reprimand, discipline and/or terminate Brown.

The City first argues that Brown did not act under color of state law.  Plaintiff contends that Brown was acting under color of state law.

"In order to establish a *prima facie* § 1983 claim, a plaintiff must show that (1) a person acting under color of law (2) deprived him of his rights secured by the United States Constitution or its laws."  *Neuens v. City of Columbus*, 303 F.3d 667 (6th Cir. 2002) (citations omitted) Whether Brown was acting under color of law is a legal issue. *Id.* In making this determination, "The fact that a police officer is on or off duty, or in or out of uniform is not controlling. However, it is the nature of the act performed which determines whether the officer has acted under color of law." *Id.* Additionally, the Sixth Circuit recognizes that "[a] police officer acts under color of state law 'when he purports to exercise official authority.' " *McGuire v. City of Royal Oak,* 295 Fed. Appx. 736 (6th Cir. 2008) (citing *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir.2005) ). "This standard can be met by 'flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations.' " *Id.* (citing *Memphis, Tennessee Area Local, American Postal Workers Union v. City of Memphis*, 361 F.3d 898, 903 (6th Cir.2004) ).  "The operative factor in determining if a person is acting under color of state law is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law ... the acts of state officials in the ambit of their personal pursuits do not constitute state action." *Burris v. Thorpe*, 166 Fed.Appx. 799 (6th Cir. 2006) (citing *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir.2001)). The court is required to consider all relevant circumstances.

*Swiecicki v. Delgado,* 463 F.3d 489 (6th Cir. 2006) (citing *Parks, supra*).

　　The Sixth Circuit has applied this analysis in cases involving actions by an off-duty police officer, as discussed below.

　　In *Neuens, supra,* off-duty police officer Bridges went into a Waffle House accompanied by a group of people, all of whom had previously been at a bowling alley where some members of the group, not including Bridges, had engaged in a fight.  The group sat in a booth not far from plaintiff and his two companions.  Members of Bridges's group immediately began verbally harassing plaintiff's group, apparently mistaking them for the people with whom they had fought earlier.  Ultimately, two members of Bridges's group, but not Bridges, punched and kicked plaintiff and his friends.  Plaintiff sued several defendants including Bridges, whom he alleged violated his substantive due process rights under § 1983. On appeal, the court determined that Bridges was acting in his private capacity as he was not in uniform, was not driving in a police car, and he did not display a badge. He was not at the Waffle House pursuant to official duties, but was out with his personal friends for social reasons. Neither Bridges nor his friends made any suggestions that Bridges was a police officer, and plaintiff had no knowledge of such.

　　In *McGuire v. City of Royal Oak*, 295 Fed. Appx. 736 (6th Cir. 2008), the two plaintiffs traveled by bus from Canada to Michigan, to attend a concert.  Following the concert, plaintiffs boarded the bus to travel home. While they were on the bus waiting to depart, another attendee was assaulted by two members of plaintiffs' group. While this occurred, one of the plaintiffs left the bus, allegedly to break up the fight, while the other plaintiff slept.  Two off-duty police officers had also attended the concert, and were leaving

9

with their families when the assault occurred. The off-duty police officers claimed to have

seen the assault occur and the perpetrators board the bus.  The officers approached the bus,

identified themselves as police officers and instructed the driver not to leave. They then

waited with the bus for the Sheriff to arrive. When the deputies arrived, the off-duty officers

again identified themselves as police officers and proceeded to assist in the investigation. One

of the plaintiffs was ordered off the bus while the deputies conducted a search. During this

time, the off-duty officers allegedly told the plaintiff  that if he did not identify the men who

committed the assault, they would pin the crime on him and "throw the book at him." One of

the off-duty officers entered the bus along with local  authorities, escorted the other plaintiff

off, and identified him as one of the assailants. The off-duty officers then stated to the

authorities that they saw both plaintiffs commit the assault. One of the off-duty officers later

stated this again in a written statement and at a preliminary hearing. Based upon the testimony

of the off-duty officers, both plaintiffs were arrested and charged with Assault with Intent to

Commit Great Bodily Harm Less than Murder. The charges were later dropped, based upon

newly discovered evidence.  After plaintiffs sued both off-duty officers under § 1983, the

court addressed whether the officers acted under color of state law.  The Sixth Circuit

concluded, "There is abundant evidence in the record that [the off-duty police officers] acted

under color of state law." In particular, they

> repeatedly identified themselves as police officers, and they leveraged this authority to
> disperse the crowd around [the victim] and to detain the bus they believed to contain
> his assailants. These actions are inconsistent with their contention that they acted as
> any citizen would, and consistent with the duty imposed upon them by the ... Police
> Department standards of conduct.

(*Id.* at 739).

10

In *Swiecicki, supra*, defendant, an off-duty police officer in full uniform, was working a baseball game as a security guard when he allegedly heard plaintiff use profane language. Defendant asked plaintiff to stop his behavior or leave the stadium.  Plaintiff did not respond. Defendant again motioned to plaintiff to halt his behavior.  When plaintiff did not stop, defendant told plaintiff, "We can either do this the easy way or the hard way." After plaintiff approached defendant, defendant grabbed him and placed him in the "escort position," and led him towards the tunnel to exit the stadium.  While walking through the tunnel, plaintiff allegedly jerked his arm away to break from defendant's grasp.  Defendant then used an "arm bar" and wrestled plaintiff to the ground, injuring him. On the ground, defendant pushed plaintiff's face into the concrete and applied pressure to his right arm.  Defendant then told plaintiff that he was under arrest.

The Sixth Circuit concluded that defendant "was a state actor from the beginning of the incident in question because he presented himself as a police officer," and defendant's actions were carried out with the authority of state law**.**  The court stated, "Our conclusion is based not only on [defendant's] attire, badge, and weapons, but also on the fact that [defendant] told [plaintiff ] that "[w]e can either do this the easy way or the hard way." The court noted that

> these words, standing alone, would not necessarily rise to the level of a threatened arrest. After all, if a private citizen like [the host greeter who had been hired to also monitor fan behavior], or a fellow Indians fan, had warned [plaintiff] in a similar manner, no threat of arrest would have been present... But we are required to consider all of the relevant circumstances.

*Id.* at 496.  The court stated that rather than calmly asking plaintiff to leave the stadium, defendant, while wearing his uniform and carrying his official weapons, threatened plaintiff

11

and forcibly removed him from the bleachers. The court concluded that this evidence, combined with the fact that defendant had been hired by the stadium to intervene in situations that required police action, "suggests that [defendant's] warning to plaintiff amounted to a threat of arrest.  Additionally, the court found that defendant apparently believed that this situation amounted to one requiring police action inasmuch as he approached plaintiff before the host greeter had a chance to further investigate.

For the following reasons, the Court finds that Brown was not acting under color of law.

Initially, the Court disagrees with the City's assertion that "this case most closely resembles the *Neuens* case... [and] all of the pertinent facts in the *Neuens* case closely mirror the facts in this case."  (Doc. 21 at 15) In *Neuens* (discussed above), unlike here, off-duty officer Bridges never identified himself as a police officer.  Nor is there any indication that he took any actions towards plaintiffs.  He was merely present among friends who attacked plaintiffs. Brown, on the other hand, did identify himself as a police officer and engage in a physical confrontation with plaintiff. As discussed below, however, an examination of all relevant circumstances does not lead the Court to believe that Brown acted under color of law.

The City points to the following actions of Brown which it asserts show that there was no manifestation of official authority present in his actions: he was off-duty; he was out of his jurisdiction; he was out of uniform; he had consumed alcohol; he did not have a weapon or handcuffs; he was driving his personal vehicle; he did not flash his badge; he only identified himself as a police officer immediately before confrontation with plaintiff; he did not place

12

anyone under arrest; he did not intervene in a dispute between third parties pursuant to regulations; he did not report this incident to his superiors as required; he did not request to be paid as a police officer for the evening; and he violated the General Police Order concerning off-duty conduct. Nor, defendant asserts, did Brown seize plaintiff within the meaning of the Fourth Amendment and plaintiff never submitted to any possible lawful authority asserted by Brown. Brown did not arrest any of the three occupants of the Bronco. Ultimately, it was the Parma police which cited Kish for disorderly conduct.

The Court agrees that consideration of all the evidence shows that defendant was not acting under color of law because the nature of the act performed demonstrates that Brown was not acting as a police officer, but merely engaging in a purely private act. In particular, Brown, who had been drinking alcohol, followed the vehicle plaintiff was riding in after observing the vehicle operating erratically. Brown had no reason to believe that the Bronco was involved in anything other than a traffic offense. Shortly before the vehicle stopped, Brown flashed his high beam lights. A reasonable driver, however, would not necessarily identify this as police behavior. In fact, plaintiff even points out that Brown admitted at deposition that the occupants of the Bronco had no reason to know that Brown was an off-duty police officer flashing his lights at them. Once the two vehicles had stopped at the bar, the events unfolded very quickly. According to Brown, two occupants ran into the bar while he exited his vehicle. Only plaintiff was outside the bar and he, too, was running. The occupants were presumably running to elude the driver of the vehicle that had been following them. As Brown was running to follow plaintiff, he yelled, "Cleveland Police." Brown overtook plaintiff before plaintiff reached the back door of the bar. Brown yelled that he was

13

a police officer, presumably as plaintiff was charging towards him and as Brown blocked the door. Brown also said, "That's assault on a police officer"as plaintiff shoved Brown. As discussed below, these statements do not insulate Brown. According to Brown, he then performed a "take-down" as plaintiff shoved him. Brown never showed his badge. Brown appeared more to be engaged in a personal pursuit rather than in the exercise of official authority. Brown did not place plaintiff under arrest, but ran inside the bar and told a patron to call the police. When the Parma police arrived, Brown was told to leave the scene because other bar patrons were yelling at him and wanting to engage him in a fight.

In *McGuire,* by contrast, the off-duty officers identified themselves as police officers and took actions evincing that authority such as instructing the bus driver to stay on the scene, assisting the sheriffs upon their arrival after telling the sheriffs they were police officers, escorting a plaintiff off the bus and making statements to the authorities as to the identity of the perpetrators. Similarly, in *Swiecicki,* the off-duty officer was in full-uniform and stationed in the stadium as a security guard. He acted entirely consistent with the role of a police officer in instructing plaintiff to halt his behavior, threatening arrest and forcibly removing plaintiff from the stadium using the "escort position."

Additionally, as the City points out, the events took place in Parma which is outside Brown's Cleveland jurisdiction. Under Ohio law, a police officer is precluded from making an arrest for a traffic offense committed outside his jurisdiction. *See* O.R.C. § 2935.05 and *State v. Crump,* 2002 WL 1393655 (Ohio App. 2nd Dist., June 28, 2002) (citing O.R.C. 2935.03 and *State v. Coppock*, 103 Ohio App.3d 405 (1995) ) ("It is a violation of law for a municipal police officer to effect a warrantless arrest outside of the geographic boundaries of

14

the political subdivision where the officer is employed, for traffic offenses committed and observed by the officer outside his jurisdiction.")  Thus, unlike the off-duty police officer in *Swiecicki* who was within his Cleveland jurisdiction having the authority to arrest and did threaten arrest, Brown did not act with such authority because he did not have the authority to make an arrest.  At the most, Brown had reason to believe that the Bronco had committed a traffic offense.  Notably, Brown had been informed that the vehicle had not been stolen.  He testified at deposition that the vehicle could still have been stolen, but not yet reported. Brown's unsupported belief in this regard could not have given him grounds to assume that a felony had been committed.[3]

Plaintiff relies heavily on *Reilly v. Hamblen County*, 2008 WL 4138117 (E.D. Tenn. Sept. 4, 2008), an unreported decision from the Eastern District of Tennessee.  *Reilly*, however, was decided on a Rule 12(b)(6) motion to dismiss.   The court, in fact, declined to convert the matter to one for summary judgment and expressly stated that it would apply the 12(b)(6) standard which, of course, is far different from the Rule 56 standards applied to motions for summary judgment and applicable herein.  Nevertheless, the case is distinguishable.

In *Reilly*, plaintiff was traveling home from work when he swerved to avoid a car and ran his truck off the road into a ditch.  When he was unable to remove his car from the ditch

---

[3]     The City filed administrative charges against Brown for violating  O.R.C. 2935.03 and failing to notify the Chief of Police or Public Information Officer as required by  General Police Order 1.1.23 which requires such notification of controversial incidents or those involving unfavorable publicity.  Brown was also charged with failure to follow a divisional notice regarding off-duty plain clothes police action. (Doc. 21 Ex. E)

line, he attempted to telephone relatives to come to retrieve him.  Because he could not obtain

a signal on his cell phone, he walked up the slope of a nearby ridge to try to obtain cell

coverage. After reaching his father by telephone, the plaintiff saw a man later identified as the

defendant, Devin Cribley, standing at the bottom of the hill.  Devin Cribley was off duty from

his employment as a police officer and had apparently been dispatched to the scene by the

volunteer fire department where he also worked.  He was dressed in civilian clothes.  He

appeared to be pointing at plaintiff and commanded the plaintiff to walk to him. Plaintiff put

his hands in the air because he did not know whether Cribley was armed and assumed that

Cribley was the owner of the land. Plaintiff walked approximately 100 yards down the

hillside toward Devin Cribley. As he approached Devin Cribley, a second man, later

identified as the defendant David Cribley, who was dressed almost identically to Devin

Cribley, walked over to him. Neither man was holding a weapon; however, the defendant

Devin Cribley was holding a radio. At that point, plaintiff put his hands down because he did

not believe he was either in danger or that either of the Cribley brothers were armed.

Suddenly, both Cribleys grabbed for the plaintiff. Plaintiff tried to wrest himself from their

grasp. Shortly thereafter, Devin Cribley identified both himself and his brother as off duty

police officers. Plaintiff was then dragged across a field, dropped him into a mud puddle and

kicked in the face.  A deputy sheriff arrived.  Plaintiff was taken into his cruiser and

transported to the Sheriff's Department. He was charged with assault and public intoxication,

and later acquitted.   The court determined that Devin Cribley acted under color of law

because he identified himself as a police officer, effected an arrest, and he was at the scene of

the accident performing duties "more akin to those performed by a police officer rather than a

16

fireman." The court stated, "The acts of arresting the plaintiff and charging him with violations of state law clearly fall within the exercise of power possessed by virtue of his law enforcement duties." Further, "Taking the facts stated in plaintiff's complaint as true, Devin Cribley relied on his status as a police officer to effect the alleged assault on the plaintiff and the alleged deprivation of constitutional rights..."

*Reilly* is an unreported district court case. Nonetheless, in the case herein, Brown did not arrest plaintiff, or charge him with an offense. Nor was Brown at the scene of the confrontation pursuant to any official authority.

Plaintiff gives much significance to the fact that Brown yelled several times that he was a police officer. Given the totality of the circumstances, this factor does not lead the Court to conclude that Brown acted under color of law. The City points to *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445 (1st Cir. 1997). While *Parrilla-Burgos* is a First Circuit decision, it does provide guidance. There, defendant was a police officer on medical leave who arrived at a bar carrying his service revolver and identification. He immediately provoked a confrontation with plaintiff's decedent, Mr. Galletti. After an initial exchange of words, defendant told Galletti, "I'll look at you whichever way I please, because I'm a cop" and "I look at anybody I want, because I'm a cop. Anybody I decide I want to look at dirty, I look at them dirty." Defendant also told a gathering crowd that he was as a police officer who was there to establish the peace and order and showed them his police identification. Galletti eventually told defendant to "leave the gun, and me and you will have it out, outside." Defendant ultimately shot and killed Galletti. The court concluded that defendant did not act under color of law despite plaintiff's reliance on the fact that defendant repeatedly said that he

was "a cop" and identified himself as a police officer, even showing his police identification.

The court stated:

> We agree that some of these factors weigh in favor of a finding of § 1983 liability. In particular, [defendant's] comments to patrons that he was there to keep the peace and his display of his police identification might, viewed in isolation, support an inference that [defendant] was acting under pretense of law by purporting to act in his official capacity. However, that conclusion was belied by the rest of [defendant's] behavior, especially his repeated assertions that he could do things such as 'look dirty' at Galletti because he was a police officer.
>
> Mere statements by individuals that they are entitled to a special privilege because of their official status do not constitute action under color or pretense of state law if the asserted privilege lies clearly outside the scope of their official duties. Statements by [defendant] that he could look dirty" at Galletti because he was a police officer so clearly fell outside his official capacity that they did not constitute a reasonable pretense that he was acting as a police officer at the time.
>
> Even more significantly, the final interchange between Galletti and [defendant] prior to their going outside the bar dominates any characterization of the events of that evening. Both parties agree that at a point just before Galletti's death, he invited [defendant] outside to settle their differences in a fight. [Defendant] accepted. From the time that the two left the bar until [defendant] shot Galletti, [defendant] made no further pretense that he was acting as a police officer.
>
> Whatever brief pretense [defendant] may have made to be acting in his official capacity by showing his identification and stating that he was keeping the peace ended when the two agreed to fight it out....

(*Id.* at 450).

Similarly, in the case herein, Brown lacked authority to arrest and detain plaintiff. Although Brown yelled that he was a police officer while chasing plaintiff and blocking his entrance into the bar, this, as the City asserts, appears to be more consistent with a civilian case of "road rage."  Brown was not acting as a police officer when he chased plaintiff for nothing more than a traffic offense.  Brown even testified that he had no idea whether or not plaintiff was driving the Bronco.  (Brown depo. 140)

18

Plaintiff additionally stresses the fact that Brown made several calls to police officers while he was following the Bronco.  Brown's companion, Fixel, however, also attempted to call a police officer with whom she was acquainted.  She, of course, was not acting in any official capacity.  Plaintiff also points out that Brown used his bright lights.  Plaintiff asserts that Brown was attempting to pull the Bronco over, and that civilians do not pull cars over.  Consequently, plaintiff contends that Brown could not have behaved in this manner without the authority of his office.  Nevertheless, Brown acknowledged at deposition that the occupants of the Bronco "had no reason to know that [he] was an off-duty Cleveland police officer that was flashing [his] lights at them."  (Brown depo. 101) Brown also testified that

> when I'm in a patrol car or a  police car, a lot of times people will flash their lights when they try to flag us down, and we'll pull up and they'll say 'Hey' – ... and sometimes, when I've been driving, people will flash me and say 'Hey, your tire's low' or 'Your gas cap's open,' and I thought that was just a way to get him to pull over.

(*Id.* 101-102).  Thus, even Brown's testimony shows that he was not necessarily exercising official authority when he flashed his lights behind the Bronco inasmuch as he has shown that civilians flash their lights to signal other types of communication.

Finally, plaintiff submits the affidavit of its expert witness, R. Kelly Hamilton, who opines that, based on the evidence he reviewed in this matter, on the subject date "Brown performed law enforcement actions under color of law for the City of Cleveland when he pursued and attacked [plaintiff.]" (Doc. 23 Ex. B) The expert is stating a legal conclusion, the very legal issue which this Court is required to determine herein.  In *DeMerrell v. City of Cheboygan,* 206 Fed. Appx. 418 (6th Cir. 2006), the court prohibited the consideration of such opinion to create an issue of fact on summary judgment.  The court stated,

> [T]he expert opinion that Plaintiff-Appellant relies upon merely expressed a legal

19

conclusion; accordingly, the district court properly ignored it. Indeed, this Circuit has held under Federal Rule of Evidence 704(a) that such testimony by an expert is improper. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994). In *Berry*, this Circuit held that '[w]hen the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue.' *Id.*

In the instant case, Plaintiff-Appellant's expert testified as to a legal conclusion because he stated that 'it was objectively unreasonable for Officer White to shoot [the decedent].' As stated previously, objective reasonableness is the precise legal standard ... be used in the qualified immunity inquiry ...  Additionally, Plaintiff-Appellant's expert's opinion further states that 'a reasonable officer on the scene would not have concluded at the time that there existed probable cause that [the decedent] posed a significant threat of death or serious physical injury to the officer or others.' This testimony also expresses a legal conclusion, going beyond 'stating opinions that suggest the answer to the ultimate issue.' Still other conclusions by Plaintiff-Appellant's expert were improper legal conclusions, namely that the 'use of deadly force by [Officer White] was improper and unnecessary.'

(*Id.* at 426)

For all of the foregoing reasons, the Court does not find that Brown was acting under color of law.  As such, the § 1983 claim fails because an element of the claim has not been met. Accordingly, the Court need not reach the issue of Brown's qualified immunity as there was no action taken under color of state law.  *See Neuens, supra* (citation omitted) ("Where no action was taken under color of state law, the district court need not reach the issue of qualified immunity.")

Nor will the Court reach the issue of whether the City is liable for its failure to train, failure to investigate prior allegations against Brown, or failure to remedy a pattern of excessive violence on his part. *Cain v. Irvin,* 286 Fed.Appx. 920 (6th Cir. 2008) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ) ("Without a constitutional violation, plaintiff's concomitant municipal liability claim fails as a matter of law.")

20

Having decided that summary judgment is warranted on the sole federal claim, the Court hereby remands the matter to state court for consideration of the state law claims.[4]  *See Doyle v. McFadden,* 182 Fed.Appx. 506 (6th Cir. 2006) (citations omitted) ("Given our finding that the district court properly granted the defendants summary judgment on all of [plaintiff's] federal claims, the district court's decision not to exercise supplemental jurisdiction over [plaintiff's ] state law claims was appropriate.")

**Conclusion**

For the foregoing reasons, defendant City of Cleveland's Motion for Summary Judgment is granted as to Count Two. The remaining claims are remanded to the Cuyahoga County Common Pleas Court.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:   5/20/09

---

[4]      The City raises immunity from suit as to the state law claims.  The Court need not resolve this issue.

21